AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

**12/3/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ MRV ___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

12/03/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm __ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No.  2:25-mj-07534-DUTY |
| Fabrizio Moretti and Geani Mitran, Defendants. | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 1, 2025 in the county of Los Angeles in the Central District of California, the

defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(3), (b)(1), (c)(1)(A)(i) | Possession of fifteen or more unauthorized access devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Alex Le, Special Agent, HHS-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    12/3/2025 at 12:18 pm

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Michael Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSA:___ Kali M. Yallourakis, x2426 _____

## AFFIDAVIT

I, Alex Le, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrants for Fabrizio Moretti ("MORETTI") and Geani Milatti, also known as Vasile Mitran ("MITRAN") for a violation of 18 U.S.C. § 1029(a)(3), (b)(1), (c)(1)(A)(i) (possession of fifteen or more unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search a black iPhone, found on the person of MORETTI, and a silver/rose gold iPhone, found on the person of MITRAN (the "SUBJECT DEVICES").  Both devices are in MORETTI and MITRAN's vehicle, currently stored at a Glendale Police Department contract impound yard, as described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft), 18 U.S.C. § 1029(a)(3), (b)(1), (c)(1)(A)(i) (possession of fifteen or more unauthorized access devices) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent of the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("HHS-OIG"), and I have worked in this position for approximately four years. I have completed a combined 16 weeks of formal education and training at the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, Georgia, and HHS-OIG's Special Agent Basic Training program in Largo, Maryland. This training included instruction in conducting investigations of access device, bank, and wire frauds, identity theft, and related crimes, and the use of computers, cell phones, and other electronics to commit these crimes. My formal education also includes a B.A. from the University of California, Irvine, and a J.D. from the University of Southern California. I have led and participated in many aspects of criminal investigations, including: collecting and reviewing physical and electronic evidence; conducting surveillance; utilizing informants; interviewing witnesses, subjects, and targets of investigation; and preparing and

serving subpoenas, search and arrest warrants, and other legal process.

6.    As an HHS-OIG Special Agent, I am a federal law enforcement officer within the meaning of 5 U.S.C. § 406, in that I am empowered by law and authorized by the Attorney General to conduct investigations, seek and execute warrants, and make arrests for federal offenses.

7.    I am currently assigned to investigate complex financial crimes involving HHS-funded programs in the Central and Southern Districts of California.  I am working in conjunction with the United States Secret Service ("USSS"), and in this capacity, my duties also include the investigation of cyber and financial crimes, including activity in connection with the fraudulent use of access devices, payment card skimming and re-encoding, identity theft, money laundering, and other frauds.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") has detected more than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

9.    on December 1, 2025, beginning at approximately 6:30 a.m., law enforcement conducted physical surveillance at a Wells

Fargo Bank located at 611 East Wilson Avenue, Glendale, CA 91206 (the "Target Bank"), which was identified by DSS as among the top ATM locations for EBT fraud.

10.  At approximately 6:30 a.m., law enforcement saw MORETTI and MITRAN arrive near the Target Bank in a black Hyundai SUV ("the SUV").  The SUV parked in front of a Bank of America, which was across the parking lot from the Target Bank. Law enforcement saw MITRAN exit the SUV and walk across to the Target Bank, where he stood at the ATM and conducted multiple transactions.  MITRAN then returned to and got inside the SUV. The SUV then departed the area.

11.  At approximately 6:37 a.m., law enforcement stopped the SUV for traffic violations.  Upon approaching the SUV, law enforcement saw, in plain view, a large amount of cash in the driver's side door pocket.  Law enforcement ordered the driver, later identified as MORETTI, to exit the SUV.  MORETTI exited the SUV and consented to a search of his person, and law enforcement found multiple cloned EBT cards in his pants and jacket pockets.  Law enforcement removed MITRAN from the front passenger seat of the SUV and searched his person, finding a wallet that contained multiple cloned EBT cards.  Law enforcement also searched the SUV and found, in addition to the large amount of cash initially seen in the driver's side door pocket, multiple cloned cards in the center console and a large amount of cash in the front passenger's side glove compartment. In total, law enforcement found approximately $11,500 in cash.

Additionally, each of the SUBJECT DEVICES were found on the persons of MORETTI and MITRAN, respectively.

12. Law enforcement analyzed the magnetic stripe on the cards seized from MORETTI and MITRAN and found that at least 22 of them were encoded with different California EBT account numbers. The cloned cards were primarily prepaid gift cards with card numbers that did not match the EBT account number encoded on to the magnetic stripe. The cards also featured colored stickers that had four-digit personal identification (PIN) numbers written on them.

13. DSS investigators report that at least three of the cloned cards are encoded with EBT account numbers that do not belong to MORETTI or MITRAN. Due to the volume of cloned cards seized, law enforcement is still in the process of identifying all the victim cardholders and obtaining records of fraudulent transactions from the Target Bank and other banks or ATMs that MORETTI or MITRAN may have visited prior to the Target Bank.

14. MORETTI identified himself to law enforcement using a suspected fraudulent Romanian driver's license with the name "Robert Ionescu" and a different date of birth. Live Scan fingerprint checks revealed a match for an individual named "Fabrizio Moretti." Law enforcement is in the process of verifying whether Fabrizio Moretti is MORETTI's true identity.

15. MITRAN identified himself to law enforcement using a suspected fraudulent international driver's license with the name "Novak Matias" and a birthplace of Czech Republic. MITRAN's Live Scan fingerprint check revealed a match for an

individual named "Geani Milatti" with a different date of birth
than the "Novak Matias" date of birth.  Based on photographs and
criminal intelligence from the USSS, law enforcement believes
Geani Milatti's true identity is MITRAN, with another different
date of birth, matching neither the dates of birth for "Geani
Milatti" or "Novak Matias."

IV. <u>STATEMENT OF PROBABLE CAUSE</u>

16.  Based on my conversations with other law enforcement
agents and my own knowledge of the investigation, I am aware of
the following:

**A.    Regulatory Background of CalFresh and CalWORKs
Programs**

17.  DSS is a government agency that administers several
benefit and assistance programs for residents of the state of
California.  One of the assistance programs administered by DSS
is called CalFresh (formerly known as food stamps), which helps
low-income households purchase food and household items to meet
their nutritional needs.  Another assistance program
administered by DSS is called CalWORKs, which helps low-income
families with children pay for housing, food, and other
necessary expenses.

18.  The U.S. Department of Health and Human Services,
Administration for Children and Families, administers the
Temporary Assistance to Needy Families ("TANF") program.  TANF
is a federally funded assistance program that awards grants to
individual states to support low-income families with children.
In California, TANF grant funds are used to operate CalWORKs.

19.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

20.  CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

21.  The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

22.  Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

23.  The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card

into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

24.  Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

25.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

26.  On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the

information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

27.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

28.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.  For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.  Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

29.  As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming.  Once that information is loaded onto another

fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

30. In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area. This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time. Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

31. As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud. Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits. As a result, law enforcement arrested approximately 16 suspects. All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States. All of the individuals arrested were released from local custody

within hours of their arrest and absconded from any future judicial proceedings.

32.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens Romania, who did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated

identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

33. In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested eleven suspects that conducted a high volume of unauthorized transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

34. Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

C.    **Background of Current Operation to Combat EBT Fraud**

35. The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and January 1, 2025, more than approximately $126.8 million in cash benefits has been stolen from victim EBT cards throughout California.

36. Of the more than approximately $126.8 million in cash benefits stolen during this year time period, more than approximately $57.9 million has been stolen from victim EBT

cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

37.  Between on or about December 1, 2024, and on or about December 31, 2024, according to data from DSS, more than approximately $11.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $11.4 million stolen from victim EBT cards in the month of December 2024, more than approximately $6.2 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

38.  Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

39.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding

stacks of cards and conducting withdrawals in quick succession at one ATM. Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

40. Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

### D. MORETTI and MITRAN Committed EBT Fraud Using Unauthorized Access Devices on December 1, 2025

41. Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement conducted a surveillance and arrest operation in December 2025.

42. Based upon my training and experience, I know EBT cardholders in California are not able to conduct cash withdrawals of the latest month's benefits from their EBT cards until approximately 6:00 a.m. on the date that the cash benefits are deposited into their account.

43. On December 1, 2025, beginning at approximately 6:30 a.m., law enforcement conducted physical surveillance of the Target Bank.

44. At approximately 6:30 a.m., law enforcement saw MORETTI and MITRAN arrive near the Target Bank in a black Hyundai SUV bearing California license plate 9ULT979 (the "SUV"). The SUV is registered to a third-party individual in Los Angeles. The SUV parked in front of a Bank of America, which was across the parking lot from the Target Bank. Law enforcement saw MITRAN exit the SUV and walk across to the Target Bank, where he stood at the ATM and conducted multiple transactions.

45. MITRAN appeared to insert several different cards to conduct withdrawals and store the retrieved currency on his person on several occasions. Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time. MITRAN then returned to and got inside of the SUV. Based on the date, the time, MITRAN using an ATM on the opposite side of the parking lot from where he parked, and MITRAN appearing to conduct multiple transactions, law enforcement followed the SUV as it left the area.

46. At approximately 6:37 a.m., law enforcement stopped the SUV for not displaying a front license plate and having a cracked windshield, both of which are violations of the

15

California Vehicle Code.  Upon approaching the SUV, law enforcement saw, in plain view, wads of cash in the driver's side door pocket.  Law enforcement ordered the driver, later identified as MORETTI, to exit the SUV.  MORETTI exited the SUV and consented to a search of his person, and law enforcement found approximately nine cloned EBT cards and three other magnetic stripe cards in his pants and jacket pockets.  Law enforcement removed MITRAN from the front passenger seat of the SUV and searched his person, finding a wallet that contained approximately five cloned EBT cards and one other magnetic stripe card.  Law enforcement also searched the SUV and found that there was approximately $4,590 cash in the driver's side door pocket.  There were approximately eight cloned cards rubber-banded together and one other magnetic stripe card in the center console.  Approximately $6,910 cash was also found in the front passenger's side glove compartment.  In total, law enforcement found approximately $11,500 in cash and 27 cards, at least 22 of which were later determined to be cloned EBT cards.  Additionally, each of the SUBJECT DEVICES were found on the persons of MORETTI and MITRAN, respectively.

47.  Law enforcement analyzed the magnetic stripe of the cards seized from MORETTI and MITRAN and determined that at least 22 of them were encoded with mismatching card numbers -- that is, the physical number embossed on the face of the card did not match the number encoded onto the magnetic stripe.  These 22 cloned cards were encoded with different California EBT BINs.  Moreover, the cloned cards also were affixed with

stickers bearing four-digit victim PIN numbers that corresponded to each cloned card and were needed in order to conduct the unauthorized ATM withdrawals.

48.  All or almost all of the cloned cards were prepaid Visa or American Express gift cards.  At least some of the cards specify on the back that there is "NO CASH OR ATM ACCESS."  The following is a photograph of some of the cloned EBT cards seized from MORETTI and MITRAN:



49.  DSS investigators queried a California EBT cardholder database and report that at least three of the cloned cards are encoded with EBT account numbers that do not belong to MORETTI or MITRAN.  Due to the volume of cloned cards seized, law enforcement is still in the process of identifying all the victim cardholders and obtaining records of fraudulent transactions from the Target Bank and other banks or ATMs that MORETTI or MITRAN may have visited prior to the Target Bank.

50. MORETTI identified himself to law enforcement using a suspected fraudulent Romanian driver's license with the name "Robert Ionescu" and a different date of birth. Live Scan fingerprint checks revealed a match for an individual named "Fabrizio Moretti." Law enforcement is in the process of verifying whether Fabrizio Moretti is MORETTI's true identity.

51. MITRAN identified himself to law enforcement using a suspected fraudulent international driver's license with the name "Novak Matias" and a birthplace of Czech Republic. MITRAN's Live Scan fingerprint check returned as Geani Milatti with a different date of birth. Based on photographs and criminal intelligence from the USSS, law enforcement believes Geani Milatti's true identity is MITRAN, with another different date of birth, matching neither the dates of birth for "Geani Milatti" or "Novak Matias."

52. Pending the issuance of a search warrant, the SUBJECT DEVICES were secured in the SUV, which is currently stored at an impound facility contracted by the Glendale Police Department.

## V. TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES

53. Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a. It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use

digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

       b.   Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

       c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

       d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and

identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units. Software relevant to such schemes can also often be found on digital devices, such as computers or cellular telephones.

e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.    Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

54. As used herein, the term "digital device" includes the SUBJECT DEVICES.

55. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

56. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

57.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.


//

//

//

## VII. <u>CONCLUSION</u>

58.  For all of the reasons described above, there is probable cause to believe that MORETTI and MITRAN committed a violation of 18 U.S.C. § 1029(a)(3), (b)(1), (c)(1)(A)(i) (possession of fifteen or more unauthorized access devices). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES as described in Attachment A.


/s/
_____
Alex Le, Special Agent, HHS-OIG


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of
December, 2025.

_____
THE HONORABLE MICHAEL KAUFMAN
UNITED STATES MAGISTRATE JUDGE